UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

HEATHER NICOLE SPINA,

      Plaintiff,

v.                                                                          CASE NO. 3:20-cv-365-MCR

ACTING COMMISSIONER OF
THE SOCIAL SECURITY
ADMINISTRATION,

      Defendant.

_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying her applications for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI").  Following an administrative hearing held on December 12, 2018, the assigned Administrative Law Judge ("ALJ") issued a decision, finding Plaintiff not disabled from February 1, 2016, the amended alleged disability onset date, through March 11, 2019, the date of the ALJ's decision.[2]  (Tr. 10-28, 153-200.)  Based on a review of the record, the briefs, and the applicable

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge.  (Doc. 20.)

[2] Plaintiff had to establish disability on or before December 31, 2016, her date last insured, in order to be entitled to a period of disability and DIB.  (Tr. 11.)

law, the Commissioner's decision is **REVERSED and REMANDED**.

## I.      Standard of Review

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.    Discussion

Plaintiff contends that the ALJ erred by failing to evaluate the opinion evidence in accordance with Agency policy and Eleventh Circuit precedent. Specifically, Plaintiff argues that the ALJ erred in assigning no weight to the opinions of her treating source, Jeffrey Brimmer, DPM, and little weight to the opinions of her examining source, Peter Knox, M.Ed., Psy.D., while according significant weight to the opinions of the State agency non-examining medical consultant, Dr. Minal Krishnamurthy.  Plaintiff explains that the ALJ erroneously relied on his own interpretation of the medical evidence and on the State agency non-examining consultants' outdated opinions, which were issued before 800 pages of additional evidence was added to the record.  Plaintiff points out that the ALJ never scheduled a review of the entire record and testimony by a medical and/or psychiatric expert; never arranged for a physical consultative examination of Plaintiff; never arranged for a new psychiatric consultative examination to address Plaintiff's mental limitations more specifically; never re-contacted Dr. Susana Barsky, Dr. Knox, and/or Dr. Brimmer for clarification or additional information; and never requested an updated review of the record by a State agency medical and/or psychological consultant.  Plaintiff also points out that the opinions of Dr. Brimmer and Dr. Knox establish far greater limitations than assessed by the ALJ.  Defendant responds that the ALJ properly

evaluated the medical opinions of record and his residual functional capacity ("RFC") assessment is supported by substantial evidence.

## A. Standard for Evaluating Opinion Evidence

The ALJ is required to consider all the evidence in the record when making a disability determination. *See* 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3). With regard to medical opinion evidence, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). Substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical evidence supporting the opinion, (4) consistency of the medical opinion with the record as a whole, (5) specialization in the medical issues at issue, and (6)

4

any other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

Although a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion, *see Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (per curiam); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2), "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a treating physician if "that opinion has been properly discounted," *Cooper v. Astrue*, No. 8:06-cv-1863-T-27TGW, 2008 WL 649244, *3 (M.D. Fla. Mar. 10, 2008). Further, "the ALJ may reject any medical opinion if the evidence supports a contrary finding." *Wainwright v. Comm'r of Soc. Sec. Admin.*, No. 06-15638, 2007 WL 708971, *2 (11th Cir. Mar. 9, 2007) (per curiam); *see also Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (same).

"The ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists, who are also experts in Social Security disability evaluation.'" *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008) (per curiam); *see also* SSR 96-6p[3] (stating that the ALJ must

---

[3] SSR 96-6p has been rescinded and replaced by SSR 17-2p effective March 27, 2017. However, because Plaintiff's applications predated March 27, 2017, SSR 96-6p was still in effect on the date of the ALJ's decision.

treat the findings of State agency medical consultants as expert opinion evidence of non-examining sources).  While the ALJ is not bound by the findings of non-examining physicians, the ALJ may not ignore these opinions and must explain the weight given to them in his decision.  SSR 96-6p.

### B.    Relevant Opinion Evidence

#### 1.    Treating Source

In a Physical Assessment, dated June 3, 2016, Dr. Brimmer opined that Plaintiff's symptoms were severe enough to constantly interfere with the attention and concentration required to perform simple work-related tasks. (Tr. 481.)  He further opined that: Plaintiff would need to recline or lie down in excess of the typical breaks during an eight-hour workday; she would need to take unscheduled breaks of 15-20 minutes, three or four times a day; she could walk only one city block without rest or significant pain, and she could stand/walk a total of zero hours and sit a total of eight hours during an eight-hour workday; she could frequently lift and/or carry ten pounds and never twenty pounds; and she would likely be absent from work as a result of her impairments more than four times a month.  (Tr. 481-82.)

#### 2.    Examining Sources

On December 20, 2016, Susana Barsky, Psy.D., LCSW, performed a general clinical evaluation with mental status of Plaintiff.  (Tr. 600.) Plaintiff stated she was unable to work due to many health problems,

including "back issues, knee issues, and . . . left ankle surgery on May 26,

2016." (*Id.* (also stating that she left her last job because her ex-fiancé asked

her to).)  Plaintiff reported that she could only cook short meals, her nerve

pain prevented her from "being on [her] feet too long," and her ability to

complete general cleaning tasks was limited due to physical limitations.  (Tr.

602-03.)

On examination, Plaintiff's affect was depressed and anxious, her mood

was dysthymic, her insight and judgment were fair, and her "motor behavior

was mildly restless, as she exhibited wringing of her hands due to anxiety."

(Tr. 602.)  Dr. Barsky diagnosed Plaintiff with a depressive disorder, NOS; an

anxiety disorder, NOS; and a GAF score of 59.  (Tr. 603.)  In a Medical Source

Statement ("MSS"), Dr. Barsky opined:

> The Claimant appears able to follow and understand simple
> directions and instructions.  She appears able to perform simple
> tasks independently.  She appears able to maintain attention and
> concentration for short periods of time but may have difficulties
> with more extensive tasks.  She appears able to maintain a
> regular schedule.  She appears able to learn new tasks.  She
> appears mildly limited in her ability to relate to others
> adequately.  She appears able to make appropriate decisions for
> herself but appears to have difficulties in her ability to deal with
> stress appropriately.
>
> The assessment of Claimant's ability to function is described in
> relation to her psychiatric functioning; it does not take into
> consideration her medical conditions, which may further impede
> her functioning.

(*Id.*)

Dr. Barsky's prognosis was "fair, given Claimant's history of effective functioning, but chronic nature of medical conditions and psychiatric symptoms, as these impede[d] her mood and functioning." (Tr. 604.) Dr. Barsky made the following recommendations:

> It is recommended that the Claimant continue under the care of medical professionals to address medical issues. She should undergo treatment with a pain management specialist. The claimant should be referred to a psychiatrist in order to review her current medication regimen and provide medication management. She should attend ongoing psychotherapy to assist [her] with developing effective coping skills to more effectively deal with chronic pain, anxiety and mood disturbances.

(*Id.*)

On December 8, 2018, Dr. Knox performed a clinical evaluation with mental status of Plaintiff and issued a detailed, 17-page report.[4] (Tr. 1423.) He noted that Plaintiff had a problem ambulating and was moving slowly. (Tr. 1427.) Plaintiff reported being disabled due to post-traumatic stress disorder ("PTSD"); a herniated disc in her back; neuropathy; carpal tunnel syndrome in her right wrist; damage to her left foot, ankle, and knee; a blood

---

[4] In rendering his opinions, Dr. Knox also reviewed the following medical records from: UF Health, dated 06/03/2016; Baptist Medical Center, dated 04/16/2016–09/10/2016; Shands Bone and Joint Institute, dated 02/22/2016–10/20/2016; St. Vincent's Medical Center South, dated 11/19/2016; Borland Groover, dated 12/13/2016; Dr. Barsky, dated 12/28/2016; UF Health Orthopaedic Surgery, dated 12/05/2016–02/20/2017; UF Health Neuroscience Institute, dated 02/22/2017; St. Vincent's Medical Center, dated 01/17/2017; Baptist Emergency at Town Center, dated 04/16/2016–04/11/2018; and Dr. Edgar Alvarez, dated 12/18/2015–09/25/2018. (Tr. 1423.)

clotting disease; a rare type of Madelungs disease and Léri-Weill Dyschondrosteosis. (Tr. 1423-24.) As part of her family history, Plaintiff reported that "she was sexually, emotionally, and physically abused at age[] five to ten from her mother and her boyfriend." (Tr. 1425.) On examination, Plaintiff's "mood appeared dysphoric and she had a somber affect." (Tr. 1426.) Dr. Knox remarked that although Plaintiff was "typically able to function adequately, periods of marked emotional, cognitive, or behavioral dysfunction [were] likely." (Tr. 1429.) He diagnosed major depression, recurrent; somatic symptom disorder; PTSD; avoidant personality disorder; and assessed a GAF score of 55. (Tr. 1439.)

On the same day, based upon his examination and review of medical records, Dr. Knox completed a Psychiatric Review Technique ("PRT") form. (Tr. 1404.) The PRT included the following diagnoses:

(1)     a major depressive disorder, recurrent, as evidenced by a depressed mood, diminished interest in almost all activities, appetite and sleep disturbance, observable psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating;
(2)     a PTSD, as evidenced by restlessness, easy fatigue, difficulty concentrating, muscle tension, and sleep disturbance;
(3)     a somatic disorder, as evidenced by symptoms of altered voluntary motor or sensory function that are not better explained by another medical or mental disorder; somatic symptoms that are distressing with excessive thoughts, feelings, or behaviors; and/or preoccupation with having or acquiring a serious illness without significant symptoms present;
(4)     an avoidant personality, as evidenced by detachment from social relationships, instability of interpersonal relationships,

9

excessive emotionality and attention seeking, and feelings of inadequacy; and

(5)     trauma- and stressor-related disorders.

(Tr. 1408-16.)  Dr. Knox opined that Plaintiff was markedly limited in interacting with others and in concentration, persistence, or pace.  (Tr. 1417.) Dr. Knox further opined that Plaintiff's limitations existed at this level of severity since her childhood/teen years.  (Tr. 1418.)

In addition, Dr. Knox completed a Mental RFC Assessment of Plaintiff, where he opined that she was markedly limited in the ability to: interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers without distracting them; maintain socially appropriate behavior; and respond appropriately to changes in the work setting.  (Tr. 1421.)  In addition, Plaintiff was moderately limited in the ability to: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; ask simple questions or request assistance; be aware of normal hazards; travel in unfamiliar places; set realistic goals or make plans independently of others; and complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace

without an unreasonable number and length of rest periods.  (Tr. 1420-21.)

### 3.     State Agency Non-Examining Sources

On January 4, 2017, based on a review of the records available as of that date, Adrine McKenzie, Ph.D., completed a PRT form, opining that Plaintiff's mental impairments were non-severe.  (Tr. 209-11.)  With respect to activities of daily living, Dr. McKenzie stated that Plaintiff attended to self-care, cared for four children and pets, drove, shopped, did household chores and all activities within physical limits, and had no problems with stress, changes in routine, or getting along with others.  (Tr. 210-11.)

On March 17, 2017, based on a review of the records available as of that date, Candace Mihm, Ph.D., completed a PRT form, opining that Plaintiff's mental impairments were non-severe.  (Tr. 247-48.)  Dr. Mihm explained:

> [Claimant's] report is generally consistent [with the] evidence in [the] file.  [Claimant] does receive [a prescription] for Celexa from [her primary care provider]; [there is] no current formal mental health [treatment].  [The mental status examination] at [the mental consultative evaluation] was benign [with the] exception of depressed and anxious mood; [Claimant's] concentration and memory were intact.  The [Claimant's] mental [activities of daily living] are not significantly limited; [her] primary limitations relate to [her] physical [symptoms].  Partial/other weight is assigned to [the mental status examination] from [the mental consultative evaluation], as this was a one[-]time snap[-]shot exam.

(Tr. 248.)

11

On March 20, 2017, based on a review of the records available as of that date, Dr. Krishnamurthy completed two Physical RFC Assessments of Plaintiff's abilities.  (Tr. 249-55.)  In the first RFC Assessment, Dr. Krishnamurthy opined that Plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; could sit for about six hours and stand and/or walk for about six hours in an eight-hour workday; and could frequently stoop, crouch, crawl, and climb ramps, stairs, ladders, ropes, or scaffolds.  (Tr. 249-50.)  In the second RFC Assessment, Dr. Krishnamurthy opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; could sit for about six hours and stand and/or walk for about six hours in an eight-hour workday; could frequently balance, stoop, crouch, crawl, and climb ramps/stairs; and could occasionally climb ladders, ropes, or scaffolds.  (Tr. 252-53.)

### C.    The ALJ's Decision

The ALJ found, at step two of the sequential evaluation process,[5] that Plaintiff had the following severe impairments: degenerative disc disease of the cervical and lumbar spine, obesity, osteoarthritis of the left ankle, history of migraine headaches, major depression, and anxiety.  (Tr. 13.)  Further, the

---

[5] The Commissioner employs a five-step process in determining disability. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

ALJ found that Plaintiff had the RFC to perform light work[6] with the
following limitations:

> [T]he claimant has the ability to lift/carry and push/pull 20
> pounds occasionally (up to one third of the day) and 10 pounds
> frequently (up to two thirds of the day), sit for four hours at a
> time and [for] a total of eight hours during an eight[-]hour day,
> and stand and/or walk for two hours at a time and [for] a total of
> six hours during an eight[-]hour day.  She can occasionally climb
> ladders; and frequently climb stairs and ramps, balance, stoop,
> crouch, and crawl. . . .  Mentally, she cannot perform complex
> tasks, but can perform simple, routine tasks consistent with
> unskilled work with concentration on those tasks for two-hour
> periods with normal breaks and a lunch.

(Tr. 16.)

    In making this finding, the ALJ discussed, *inter alia*, Plaintiff's
subjective complaints, the objective medical findings, the treatment and
examining records, and the opinion evidence.  (Tr. 16-26.)  With respect to the
opinion evidence, the ALJ made the following findings:

> [The ALJ] gives no weight to the opinion of Jeffrey Brimmer,
> DPM (Exhibit 1F/3-4), as his opined severity is not supported by
> objective medical findings (Exhibits 3F and 7F) and is
> inconsistent with the medical evidence of record, which does not
> document anything more than conservative treatment after the
> initial surgery.  Furthermore, this opinion was given just one
> month following surgery.
>
> The [ALJ] also gives little weight to the opinion of Dr. Knox

---

    [6] By definition, light work involves lifting no more than twenty pounds at a
time with frequent lifting or carrying of objects weighing up to ten pounds; it
requires a good deal of walking, standing, or sitting most of the time with some
pushing and pulling of arm or leg controls.  20 C.F.R. §§ 404.1567(b), 416.967(b);
SSR 83-10.

(Exhibits 14F and 15F); as his assessed marked limitations are completely inconsistent with the claimant's conservative treatment as well as his own examination and documented GAF score of 55, which suggests no more than moderate symptoms. Furthermore, his opinion is inconsistent with a prior consultative examination from Dr. Barsky who assessed a depressive disorder, NOS and anxiety disorder, NOS with a GAF of 59, which again suggests no more than moderate symptoms (Exhibit 6F). The [ALJ] also notes that the claimant underwent the examination that formed the basis of this opinion not in an attempt to seek treatment for symptoms, but rather, through attorney referral and in connection with an effort to generate evidence for the current appeal. Furthermore, the doctor was presumably paid for the report. Although such evidence is certainly legitimate and deserves due consideration, the context in which it was produced cannot be entirely ignored. The [ALJ] also notes that none of the claimant's treating mental health providers have identified any specific job-related limitations and have consistently found the claimant's major depressive disorder to be moderate in severity, as evidenced by ACE Behavioral Health records (Exhibit 13F).

The [ALJ] gives some weight to the opinion of Dr. Barsky (Exhibit 6F) as it is supported by objective medical findings. Furthermore, Dr. Barsky's opinion is consistent with the conservative treatment and lack of more aggressive psychiatric care. The [ALJ] notes that records from the claimant's primary care physician covering the period [of] December of 2015 through September of 2018 document normal psychiatric exams (Exhibit 11F) and records from a treating mental health professional covering the period [of] July of 2018 through November of 2018 document essentially normal mental status exam[inations] except for depressed or blunted affect (Exhibit 13F).

The [ALJ] gives significant weight to the opinions of the State agency medical consultant (Exhibits 5A and 6A) inasmuch as it [sic] would not preclude light exertional level work activities. However, this physician cited a medium grid rule despite finding a light [RFC] for the period prior to the claimant's date last insured. Likewise, limited weight is given to the opinions of the State agency psychologists [sic] findings of no more than mild mental limitations and non-severe mental impairments before

14

and after the claimant's date last insured (Exhibits 1A, 2A, 5A, and 6A), as newer evidence does suggest moderate mental limitations, which would preclude complex tasks, but allow for simple, routine tasks consistent with the above noted [RFC] finding.  The [ALJ] notes that while he did find the claimant to have severe impairments of both depression and anxiety, he did not assess limitations with socialization and considered the claimant's anxiety with the limitations to simple, routine tasks.

. . . Per DSM-IV, GAF scores between the range of 51-60 indicate moderate symptoms OR moderate difficulty in one area of functioning.  The undersigned notes that the claimant's GAF scores paint a longitudinal picture of someone who has benefited from treatment; therefore, they are given some weight.

(Tr. 24-25.)

The ALJ concluded that his RFC was supported by the following:

First, the claimant has described daily activities, which are not entirely limited.  At one point or another in the record, the claimant has reported the following activities: being the primary caretaker for her four children (current ages 3, 5, 13, and 16), cooking simple meals, taking care of personal needs, doing light house cleaning, helping with laundry, driving daily, shopping with her children, being able to manage finances, and going to church 3-4 times a month (Exhibits 5E and 6F/4-5, and testimony).

Second, although the claimant has received treatment for the allegedly disabling impairments, that treatment has been essentially routine and/or conservative in nature.  The record shows the claimant did undergo surgery to her left foot/ankle, which certainly suggests that the symptoms were genuine; however, the record reflects that the surgery was somewhat generally successful in relieving her symptoms.  Furthermore, examinations and diagnostic testing, which have been discussed/outlined above, do not document any objective medical findings that would prevent the claimant from performing work activity within the established [RFC] . . . .

15

The [ALJ] notes that MRIs received post-hearing do show some positive objective findings; however, they do not show impairments that would warrant a finding of disability. Namely[,] following a recent motor vehicle accident on October 8, 2018, cervical spine MRI showed multiple level disc herniations, but without evidence of cord effacement, spinal stenosis or neural foraminal narrowing (Exhibit 19F/3). Likewise, MRI of the lumbar spine showed nothing more than bulges with no cord compression, spinal stenosis or neural foraminal narrowing (Exhibit 19F/6). Furthermore, the claimant notably has not required surgical intervention for any of her neck or back impairments. The record does document a history of an earlier surgery on her left ankle in 2016; however, she has only received routine treatment since that time. The [ALJ] notes that, while the claimant does report a history of migraine headaches, these are not documented to the extent alleged. She testified that she has two or three migraine headaches per week and that they last all day even with her Topamax and Fioricet; however, this is not documented by the evidence. Regarding the claimant's mental impairments, medical records show she has been assessed with major depression and anxiety, and that she had treatment at a hospital when she passed out approximately one year prior to the hearing (Exhibit 10F/29); however, she notably has not required in-house psychiatric hospitalization or prolonged psychiatric counseling.

Third, a review of the claimant's work history shows that the claimant worked only sporadically prior to the alleged disability onset date (Exhibit 8D), which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments. Furthermore, there is evidence that the claimant stopped working for reasons not related to the allegedly disabling impairments (Exhibit 6F/2).

(Tr. 25-26.)

Then, at step four, the ALJ determined that Plaintiff was unable to perform any past relevant work. (Tr. 26.) However, at the fifth and final step, the ALJ determined that there were jobs existing in significant numbers

16

in the national economy that Plaintiff could perform, such as an inspector, a garment folder, and a hand packager.  (Tr. 27-28.)  All of these representative jobs are light, unskilled, with a Specific Vocational Preparation ("SVP") of 2. (*Id.*)

### D.    Analysis

The Court agrees with Plaintiff that the ALJ improperly evaluated the opinion evidence.  The ALJ gave significant weight to Dr. Krishnamurthy's non-examining opinion "inasmuch as it would not preclude light exertional level work activities."  (Tr. 25.)  However, in March of 2017 when Dr. Krishnamurthy issued his opinion based on a review of an incomplete record, he did not have the benefit of reviewing and considering any of the subsequent treatment records, emergency room records, physical therapy progress notes, diagnostic test results, as well as Dr. Knox's December 8, 2018 opinions, corroborating Plaintiff's claim of disability.

Defendant argues that it was not an error for the ALJ to rely on Dr. Krishnamurthy's outdated opinion because the ALJ had the benefit of reviewing the complete record before issuing his decision.  Even accepting Defendant's position, the Court notes that the ALJ's reasons for essentially rejecting the treating and examining opinions, while according significant weight to the non-examining opinions, are not supported by substantial evidence.

First, the objective medical findings were not as unremarkable as the ALJ seems to suggest.  Plaintiff's examinations regularly revealed, *inter alia*, pain and tenderness throughout her body; ongoing spasms and guarding; paresthesia of both hands and feet and of the left shoulder, thigh, and leg; left ankle/foot swelling; antalgic gait; painful range of motion; some positive Straight leg raising tests; and some positive Spurling's tests on the left.  (*See* Tr. 62-63, 66, 69, 72, 75, 77, 99, 484, 491-92, 512, 527-28, 531, 533, 571, 729-30, 735-36, 740-41, 746, 751, 756, 766, 771-72, 784, 794, 801, 811, 818-19, 823-24, 849, 881, 893, 951, 966, 983-84, 997, 1000, 1084, 1104-05, 1110, 1176, 1190, 1206, 1220, 1237, 1245-46, 1251-52, 1255, 1280, 1299, 1301, 1306, 1310, 1317, 1321-23, 1339; *but see* Tr. 1277 ("Patient reports adequate pain control with no medications [on March 16, 2018].").)

Further, many of Plaintiff's diagnostic test results, particularly the more recent ones, were abnormal.[7]  (*See, e.g.*, Tr. 1342 (noting that a March 22, 2016 left ankle MRI showed chronic tear of the anterior talofibular ligament); Tr. 1355 (noting that a July 7, 2016 left ankle X-ray showed soft tissue swelling); Tr. 687 (noting that a January 26, 2017 left ankle X-ray showed "[d]iffuse left ankle soft tissue swelling most marked laterally" and

---

[7] Some of the diagnostic test results from 2016 and a few from 2017-2018 were largely normal.  (*See* Tr. 489, 493, 510, 512, 514, 562, 581, 587, 620-22, 643, 645.)

"[w]ell-corticated ossicle inferior to the lateral malleolus likely sequela of old trauma"); Tr. 1364 (noting that a May 24, 2017 left ankle MRI showed, *inter alia*, chronic ankle sprain and chronic tear of the mid-substance of the calcaneofibular ligament); Tr. 661 (noting that a July 7, 2017 left ankle X-ray showed soft tissue swelling); Tr. 1369 (noting that an April 24, 2018 lumbar MRI showed "[m]ild degenerative changes [at] L3/L4 as described with small right paracentral disc protrusion"); Tr. 1372 (noting that a July 16, 2018 right ankle X-ray showed mild to moderate degenerative changes of the talonavicular joint); Tr. 1380 (noting that an August 3, 2018 left ankle MRI showed, *inter alia*, probable chronic tear of the mid-substance of the calcaneofibular ligament); Tr. 97 (noting that an October 27, 2018 lumbar MRI showed, *inter alia*, "1 to 1.5 mm bulging at L1-L2 and 1 to 1.5 mm bulging asymmetric toward the right side at L3-L4" and "1 mm anterolisthesis of L4 on L5 in neutral position"); Tr. 95-96 (noting that a November 25, 2018 cervical MRI showed: "1.5 mm central herniations at C3-C4, C4-C5, and C5-C6. . . . Straightening of the cervical lordotic curvature may be secondary to positioning vs. muscle spasm.  1mm anterolisthesis of C2 on C3 and 1.5 mm anterolisthesis of C5 on C6 in neutral position may represent some mild laxity of the posterior longitudinal ligament. . . . Lesion in the posterior aspect of the C3 vertebral body may represent a hemangioma"); Tr. 100 (noting that an electrodiagnostic study from February

19

4, 2019 showed left cervical radiculopathy at C5).)[8]

Those results, along with the physical examination findings and Plaintiff's course (and frequency) of treatment, lend support to Plaintiff's complaints of disabling symptoms.  Plaintiff's treatment included: a left ankle surgery; injections; medications, such as Hydrocodone-acetaminophen (Norco), Flexeril, Naproxen, Lyrica, Fioricet, Topamax, Wellbutrin, etc.; physical therapy, including a traction unit, a TENS unit, electrical stimulation, ultrasound, heat/ice packs, etc.; manual therapy; a home exercise program; chiropractic treatment; a sling for her left shoulder; compression stockings; topical lidocaine cream; an ankle brace or boot; and crutches for ambulation.  (Tr. 62-63, 66, 70, 72-73, 75-76, 91-94, 104-52, 175, 177, 432, 511, 515, 999, 1184; *see also* Tr. 531 ("[Patient] continues to have pain despite all attempts [at] conservative care."); Tr. 534-35 ("[Patient] has failed conservative [treatment,] including but not limited to: [over-the-counter] and [prescription] med[ications], bracing, at-home and formal [physical therapy], offlaodin/padding [sic], [and weight bearing] changes.").) As part of her treatment, Plaintiff was advised, *inter alia*, to pace her home activities and avoid lifting more than 20 pounds, to continue using crutches

---

[8] The ALJ seemed to discount some MRI results based on the lack of evidence of cord effacement, spinal stenosis, or neural foraminal narrowing, when there were other positive findings, such as disc herniations and bulges, which, by themselves, could cause disabling impairments.  (Tr. 26)

for ambulation, to rest, and to avoid bending/twisting activities. (Tr. 63, 67, 70, 78, 515; *see also* Tr. 662 ("Limitations: Limited activity. Limited work.").) Aside from her left ankle surgery, Plaintiff was also advised to consider surgery for her cervical radiculopathy and left shoulder injury. (*See* Tr. 63, 67, 70.)

The ALJ suggested that Plaintiff's May 26, 2016 left ankle "surgery was somewhat generally successful in relieving her symptoms." (Tr. 26.) However, Plaintiff testified that she still experienced a lot of swelling, nerve pain, and cramping daily, despite the variety of treatments. (Tr. 173, 177-78.) Moreover, the medical records confirm that Plaintiff continued to experience pain (from 3/10 to 10/10 in intensity) and edema of the left ankle and/or numbness and tingling in her foot after the surgery. (Tr. 538, 547-48, 556, 564-66, 607-08, 612, 616, 624-25, 633, 646, 657-58, 662, 683-85, 735, 766, 832, 842, 854, 859, 862, 906, 911, 946, 1085, 1154-55, 1171, 1184-85, 1189, 1200-01, 1205, 1208, 1211, 1223, 1227, 1231, 1240, 1244, 1274, 1293-94, 1298, 1310, 1314, 1317, 1333; *but see* Tr. 964 ("So far doing fine, bearing weight, ambulating without crutches[.]").)

Based on the foregoing, the Court cannot conclude that the ALJ's reasons for discounting Dr. Brimmer's opinions, while according significant weight to Dr. Krishnamurthy's opinions, were supported by substantial evidence in the record. In support of his RFC, the ALJ also mentioned

Plaintiff's migraine headaches, but found them "not documented to the extent alleged." (Tr. 26 ("She testified that she has two or three migraine headaches per week and that they last all day even with her Topamax and Fioricet; however, this is not documented by the evidence.").) Yet, Plaintiff's headaches are clearly documented in the record consistent with her testimony. (*See* Tr. 62 (noting that, as of March 5, 2019, Plaintiff still had occipital headaches about 4-5 times a week), 66, 72, 77, 184-86, 502, 511, 596, 683, 722, 756-57, 759 ("Persistent headache-R51- Refer to Neurology"), 765, 779, 789, 829, 997, 1324-31 (noting that, on September 4, 2018, Plaintiff presented for severe migraines and pressure in the back of her head occurring several times a week).)

In addition, the ALJ also referred to Plaintiff's daily activities, which he found to be "not entirely limited" because Plaintiff was taking care of her children, cooking simple meals, taking care of personal needs, doing light house cleaning, helping with the laundry, driving daily, shopping with her children, managing finances, and going to church. (Tr. 25-26.) However, Plaintiff testified that her two older children, who were 16 and 13 years old at the time of the hearing, helped her take care of the two younger children and did three-quarters of the housework. (Tr. 159, 173, 177, 192-93, 428.) Moreover, the performance of such limited daily activities is not necessarily inconsistent with Plaintiff's allegations of disability. *See, e.g.*, *Flynn v.*

*Heckler*, 768 F.2d 1273, 1275 (11th Cir. 1985) (per curiam) (reversing and remanding the case to the Commissioner for lack of substantial evidence to support the finding that the claimant had no severe impairment, even though the claimant testified that she performed housework for herself and her husband, accomplished other light duties in the home, and "was able to read, watch television, embroider, attend church, and drive an automobile short distances"); *White v. Barnhart*, 340 F. Supp. 2d 1283, 1286 (N.D. Ala. 2004) (holding that substantial evidence did not support the decision denying disability benefits, even though the claimant reported that she took care of her own personal hygiene, cooked, did housework with breaks, helped her daughter with homework, visited her mother, socialized with friends sometimes, and, on a good day, drove her husband to and from work, but needed help with grocery shopping, and could sit, stand, or walk for short periods of time).

Because the ALJ's reasons for discounting Dr. Brimmer's opinions, while according significant weight to Dr. Krishnamurthy's opinions, were not supported by substantial evidence in the record, and the ALJ's additional reasons for finding Plaintiff capable of performing a reduced range of light work also do not seem supported by substantial evidence, the Court need not address the arguments regarding Plaintiff's mental limitations.  However, on remand, the ALJ shall reconsider all opinion evidence in the record and

23

conduct any further proceedings deemed appropriate.

Accordingly, it is **ORDERED**:

1.     The Commissioner's decision is **REVERSED and REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), with instructions to the ALJ to conduct the five-step sequential evaluation process in light of all the evidence, including the opinion evidence from treating, examining, and non-examining sources, and conduct any further proceedings deemed appropriate.

2.     The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

3.     In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012).  This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**DONE AND ORDERED** at Jacksonville, Florida, on August 13, 2021.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record